UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**CARLOS I. URESTI and STANLEY P. BATES,**<br><br>Defendants. | Case No.: 5:18-cv-1013<br><br>Jury Trial Demanded |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Defendants Carlos I. Uresti ("Uresti") and Stanley P. Bates ("Bates") (together, "Defendants") and alleges as follows:

## SUMMARY

1. From approximately April 2014 through October 2015, Bates, through the company he founded and controlled, FWLL, LLC (a/k/a Fourwinds Logistics Laredo) ("FWLL"), and Uresti, a well-known Texas state senator and attorney, raised over $11 million from investors to purportedly buy and sell sand used in hydraulic fracking to extract oil and gas. While some sand was purchased and sold, Bates spent most of the money on lavish and improper payments and expenses.

2. Bates made a variety of material misrepresentations and omissions to investors. For example, Bates misrepresented his background and experience, overstated the profitability

and safety of the investments, and failed to disclose his misuse of investor funds to make Ponzi payments to earlier investors and to make extravagant office and personal expenditures. Bates also provided investors with a doctored bank statement showing FWLL had $18.8 million in the bank, when in reality FWLL had less than $100,000.

3. Uresti served as FWLL's company counsel, escrow agent, and unlicensed securities broker. He secured three large investors for FWLL, including a legal client and financially unsophisticated single mother for whom Uresti had obtained a large settlement after two of her children died in a car crash. Uresti convinced his client to invest $900,000 in the FWLL venture, pocketed a large undisclosed commission, and then, without her knowledge, assigned himself an additional percentage of future profits from her investment. Uresti also made material misstatements and omissions to investors regarding the security of their investments, Bates's background and experience, and the FWLL business.

4. By reason of the foregoing, Defendants Bates and Uresti violated, and unless enjoined will continue to violate, the anti-fraud and registration provisions of the federal securities laws. In the interest of protecting the public from further violations of the federal securities laws, the SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, civil penalties, an officer-and-director bar, and all other equitable and ancillary relief the Court deems necessary.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The joint-venture interests offered, purchased, and sold as

alleged herein are securities as that term is defined under the federal securities laws. Defendants directly or indirectly made use of means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

6. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Certain of the transactions, acts, practices, and courses of business constituting alleged violations of the federal securities laws occurred within this district.

## DEFENDANTS

7. Defendant Uresti is an individual who is believed to reside in San Antonio, Texas. Uresti was FWLL's company counsel, escrow agent, and 1% owner. Uresti was also a Texas State Senator and licensed attorney until he voluntarily surrendered his bar license in April 2018 and resigned his senate seat in June 2018, following his criminal conviction.

8. Defendant Bates is an individual who is believed to reside in San Antonio, Texas. Bates was the founder, Chief Executive Officer, and 51% owner of FWLL.

## STATEMENT OF FACTS

*A.   The FWLL, LLC Offering*

9. In July 2013, Bates formed FWLL, LLC, a Texas limited liability company with its principal place of business in San Antonio, Texas, to buy and sell sand used in hydraulic fracturing to extract oil and gas from shale rock. The fracking industry in the Eagle Ford, a shale play that extends from the Oklahoma/Texas border southward to San Antonio and westward to West Texas, was booming. Bates needed a way to make money following his discharge from the military and an unsuccessful turn in the auto-sales industry. Bates started FWLL with the idea to

solicit investor funds to buy fracking sand, transport it to the Eagle Ford, and then sell it for a high markup.

10. In or about April 2014, Bates began operating FWLL as a purported business. Bates served as FWLL's Chief Executive Officer and was its 51% owner. Bates brought in a former auto-sales contact to operate FWLL, while Bates focused his efforts on soliciting investors and recruiting others to solicit investors.

11. One of the individuals Bates recruited was Uresti, who at the time was a Texas State Senator and a licensed attorney. Uresti, whose involvement began in May 2014, served three roles at FWLL: (1) company counsel, for which he was paid a monthly retainer fee and given a 1% ownership stake in the company; (2) escrow agent for certain investors, for which he was also paid a fee; and (3) unlicensed broker for which he received commissions for bringing investors to FWLL. By agreement, Uresti would receive a 3% commission for any investment secured by him, along with an additional 10% of the profits generated by that investment. Further, Uresti would receive 20% of the profits for every subsequent investment made by an investor he brought to FWLL.

12. The investments were offered and sold in an integrated offering using investment contracts typically styled as Joint Venture Agreements ("JVAs"). Each investor or investment group executed a separate JVA, which gave a distinct name to the new venture entity, designated FWLL as the managing venturer, and dictated the terms of the investment. Investors were assured through verbal promises and the terms of the investment contracts that their investment would be "limited to purchasing, warehousing and reselling lots of fracking sand for use in production of petroleum products . . ." minus certain administrative costs which were not to exceed $20,000 per month.

13. Each JVA contained a breakdown for distribution of profits of the venture, generally 50% for FWLL and 50% for the investor.  All of the ventures were under the common control of FWLL, which was the managing venturer and a minimum 50% owner of each venture.  FWLL made all the business and management decisions for the ventures, and all the ventures were formed with the same purpose, to buy and sell frack sand.  FWLL also frequently disregarded the entity form by commingling investor funds between joint-ventures and, in at least one instance, paying investors fictitious returns with another investor's money.

14. The joint-venture interests offered and sold to investors are investment contracts and thus securities within the meaning of the Securities Act and the Exchange Act.  The investors paid money to purchase the interests, and the investors' fortunes were dependent on the efforts and expertise of FWLL and its personnel.  None of the investors had experience managing an oil-and-gas venture.   Further, the investors had no meaningful management powers in the venture, they played no role in the management or operations of the business, and they expected to receive profits from their investments derived solely upon the efforts and expertise of FWLL and its personnel.

15. No registration statement was filed with the SEC or otherwise in effect as to the offer and sale of the join-venture interests.  No registration exemption applied to the offer or sale of the joint-venture interests.

## B.   *Defendants' Fundraising and False Claims*

16. Defendants began soliciting investors in the spring of 2014, and each Defendant actively offered and marked the investment contracts to investors.  Defendants approached their contacts, and the investment was further offered through a general solicitation using a Facebook advertisement and large group emails to known wealthy individuals in multiple states, several of

whom had no prior relationship with Defendants or FWLL.  Defendants and FWLL failed to take any steps to verify the accredited status of its investors.

17. Once a potential investor was identified, Bates led sales pitches to sell the investment.  Uresti attended and participated in several of the sales pitches.  Ultimately, Defendants secured investments totaling approximately $11.2 million from five investor groups or individuals, including investors in Texas and Mexico.  Bates brought in two of the investors, and the other investors were brought in through Uresti and his contacts.

18. Bates made multiple misrepresentations and omissions to the investors during the sales pitches.  For example, Bates name-dropped local business personalities, celebrities, and professional athletes who had purportedly invested or were interested in FWLL, bragged about being a sniper in the U.S. Marine Corps, claimed to have invested $2 million of his own money in FWLL, and proclaimed that another company had offered to buy FWLL for $200 million.  As Bates knew, these claims were false.

19. Before becoming involved with FWLL, Uresti was warned by a close friend who had known Bates for years that Bates was not trustworthy.  However, Uresti was facing financial difficulties and believed he stood to potentially make millions through his involvement with FWLL.  So Uresti backed Bates's false claims, telling potential investors that Bates was a successful and legitimate businessman with a lot of experience in the fracking business.  Uresti did not disclose the warnings he had received about Bates.  For example, Uresti represented to a group of investors from Mexico in late May or early June 2014 that Bates was trustworthy, the company was legitimate, and Bates was an expert who had been doing this business for years and making money.  Uresti knew, or was at least severely reckless in not knowing, that his statements and omissions to investors were false, including based on the warnings he received,

his interactions with Bates about his background and the company, his role and observations as company counsel, and his review of company documents and offering materials, materials that often-changed without explanation.

20. Further, when one of the investors questioned FWLL's track record, Bates responded, "let me put that to bed," and provided him a bank statement showing a balance of $18.8 million in FWLL's operating account. Bates told another investor that FWLL did not need their money because they already had too many investors. When that investor expressed concerns that FWLL did not have sufficient funds to support the company's operational and administrative costs, Bates also showed him the $18.8 million bank statement. In reality, there was only $98,897 in the account. Bates had ordered FWLL's IT employee to alter the bank statement to read $18,798,897, thereby falsely leading investors to believe FWLL was a thriving company.

21. Uresti forwarded the fabricated bank statement to one or more investors, including his legal client, and was included on communications attaching the fabricated bank statement. Uresti knew, or was at least severely reckless in not knowing, that the bank statement was false and deceptive. Uresti's communications with company personnel and other FWLL financial documentation he received was not consistent with this newly-started venture purportedly having $18.8 million in the bank. Further, Uresti saw that the bank statement balance remained the same, even though it was sent to different investors at different times, which was another red flag that it had been fabricated.

22. When soliciting investors, Bates and Uresti emphasized the purported safety and profitability of the investment. To that end, Bates and Uresti touted Uresti's position as a Texas State Senator in the sales pitches, assuring investors that Uresti would never risk his reputation

and position on a bad deal and further emphasizing how his position as a state senator and purported connections with oil companies could help FWLL.  Uresti also falsely told some investors that he was an investor and had already made money, for example, telling a group of investors in May 2014 that this was a good investment and that he himself had taken the risk with FWLL.  Several of the investors have made clear that they would not have invested in FWLL without Uresti's involvement and assurances.  These assurances, however, were false and misleading.  Uresti was enthusiastically recommending the investment on its purported merits, but he failed to disclose that he had performed no diligence on the FWLL venture to support his recommendation, much less invested any of his own money.

23.     The most glaring example of Uresti's misconduct began in or about late May 2014, when Uresti personally solicited one of his legal clients to invest in the FWLL venture.  Uresti represented the investor in a wrongful death lawsuit arising from the loss of two of her children in a vehicle accident.  The suit was settled for a large sum, which she used to purchase a home and to invest with a financial advisor in a diversified portfolio for her and her surviving children's future.  The investor believed Uresti was not only her lawyer, but also her financial advisor and trusted confidant.  Uresti also engaged in an intimate relationship with the investor, furthering the relationship of trust and confidence.

24.      Uresti convinced his client to pull $900,000 from her investments with her financial advisor and to invest those funds in the FWLL venture.  She invested $800,000 in June 2014 and then another $100,000 in August 2014.  Uresti reviewed the investment documentation for his client.

25.     To induce her to invest, Uresti told his client that her investment was guaranteed, that she could get her money back after a year if she was not satisfied, and that she would make a

$100,000 monthly profit on her investment. Uresti did not disclose any of the negative information he knew about Bates, instead telling his client it was a perfect investment for her. Uresti knew, or at a minimum was severely reckless in not knowing, his statement and omissions were false and misleading, including based on his knowledge of Bates's background, the company's business and track record, and his review of the investment documentation. In addition, in late May 2014, Uresti sent his client an email attaching the fabricated bank statement discussed above as further assurance of FWLL's legitimacy.

26. Uresti also misled his client about his interest in FWLL and his compensation. Uresti led her to believe that he was an investor in the FWLL venture and that he was also receiving compensation for providing legal services to the company. But Uresti, who was facing financial difficulties, did not disclose that he would receive a 3% commission on her investment before she invested the initial $800,000, and Uresti never told her that he would take a portion of any profits on her investment.

27. Further, unlike the other JVAs that distributed profits 50/50 between the investor and FWLL, the investment Uresti sold to his client dictated in the JVA that she would receive only 40% of her profits while FWLL would receive 60%. What the JVA did not describe, and what Uresti knew but did not tell the investor, is that the standard was a 50/50 split and that Uresti had entered into a side agreement entitling him to receive the additional 10% being taken from her share and ostensibly allocated to FWLL. Uresti led her to believe he had vetted her investment as a trusted advisor and confidant, not someone who was receiving a commission and a piece of any profits on her investment.

28. As another example, Uresti induced a group of investors from Mexico and Texas to invest in August 2014 by representing that he would act as an escrow trustee over their

investment funds. Uresti told the investors that their investment was 100% secure and that FWLL would never have control over their money. He assured the investors that their funds would be held in an escrow account he controlled and only disbursed to buy sand directly from third parties, with the investors' share of the profits then returned to the escrow account. But Uresti's representations were false, because after the investor funds were deposited in the escrow account at his law firm, Uresti caused funds to be transferred to a FWLL bank account where they were comingled with other funds and used to pay a different investor and/or FWLL expenses. Uresti also vouched for Bates and the company without disclosing any of the negative information he knew, and he failed to disclose to the investors that he was taking a share of the profits from their investment, while at the same time purporting to be their escrow trustee.

### C.     *Misuse of Investor Funds*

29.     In the beginning, it appears that FWLL did use some investor funds to buy and sell sand, although never in the volume Bates claimed. However, Bates ultimately misused and misappropriated most of the investor funds to pay for expenses far outside those contemplated or authorized by the JVAs. Among other improper expenditures, Bates used investor funds to pay for prostitutes, to buy drugs, to pay models to work in the office, to pay for his mother's residential move (classified as "corporate housing"), to make child support payments, to pay his son's fraternity dues, and to purchase expensive clothing, dining, luxury car rentals (including a Ferrari), designer shoes for his girlfriends (classified as "investor relations expenses"), an ATV, and other personal luxury items. Bates also used new investor money to pay fabricated investment returns to earlier investors, and he paid at least one investor, Uresti's legal client, a portion of her own investment back as a purported investment return.

30.     To conceal the misuse of investor funds, Bates directed a FWLL bookkeeper to

reclassify and recode items in the company's Quickbooks records to hide them from investors and anyone who might examine the books. Bates also directed the bookkeeper to create and provide a spreadsheet to Uresti's legal client falsely depicting her flow of funds from purchasing her "sand" and selling it to oil and gas companies, when in reality no sand was ever purchased with her money. The falsified spreadsheet also did not list the payments to Uresti, which further concealed Uresti's commissions and kickbacks. At Bates's direction, the bookkeeper also sent Uresti's legal client false Bills of Lading meant to show that FWLL was purchasing sand for her account when the Bills of Lading actually related to purchases for other investors. In truth, FWLL used her investment funds for personal and other improper expenses, to compensate Uresti, and to send her fabricated returns using her own money.

31. A reasonable investor would consider the misstatements and omissions alleged above, including the misstatements and omissions about Bates background and track record, the FWLL business and finances, the use of investor funds, Uresti's purported protection of investor funds in escrow, and Uresti's role and compensation, important in deciding whether to invest.

### D.   The End of FWLL.

32. By early 2015, investors had received minimal or no return of, much less a return on, their investments. Bates directed the bookkeeper to placate investors, but eventually it became clear FWLL had no money, and was not buying or selling sand. In April 2015, creditors forced FWLL into involuntary bankruptcy, with creditors' claims exceeding $14 million.

33. While the investors lost most or all of their money, Uresti obtained over a $100,000 in commissions, fees, and fabricated profit-sharing as a result of his misstatements and omissions that brought investor funds to the FWLL venture. The money was paid directly to Uresti, his law firm, or a consulting company he owned and controlled.

34.     The United States Attorney's Office for the Western District of Texas indicted Bates and Uresti in May 2017 on charges relating to the FWLL fraud.  Shortly before trial began, Bates pleaded guilty to all of the charges, including two counts of securities fraud.  The case went to trial in January 2018.  A jury found Uresti guilty on all charges, including two counts of securities fraud and one count of acting as an unregistered securities broker.  Bates and Uresti were sentenced to 15 and 12 years in prison, respectively, and each ordered to pay, jointly and severally with the other named defendants, $6.3 million in restitution.  Uresti voluntarily surrendered his bar license in April 2018 and resigned his senate seat in June 2018.

### E.    *Uresti and Bates Acted As Unregistered Brokers*

35.     Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from using jurisdictional means such as the telephone or mails to effect transactions in securities unless the broker or dealer is registered with the SEC.  Section 3(a)(4) of the Exchange Act defines a "broker" as any person who is engaged in the business of effecting transactions in securities for the account of others.

36.     From approximately April 2014 through October 2015, Uresti and Bates used the telephone and the mails to actively solicit investors in multiple states to purchase the investment-contracts described above.  Uresti and Bates offered and sold the investments contracts to investors, thereby effecting transactions in the securities for the accounts of others.

37.     Uresti acted as a broker in these transactions.  He was regularly involved at key points in the chain of distribution of the securities, and he personally solicited investors to purchase the securities.  When soliciting, Uresti made valuations as to the merits of the securities by describing their purported safety and profitability.  Uresti also received transaction-based compensation from FWLL for the investments he solicited.  Uresti was not registered as a broker or

associated with a registered broker-dealer at the time of these transactions.

38. Bates also acted as a broker in these securities transactions. He established a three-person sales team that solicited investors. He entered into agreements with each member of the sales team to pay them transaction-based compensation for any FWLL securities they sold. Bates instructed them on what information to provide investors regarding the investment. For use in investor solicitation, he drafted and furnished documents containing projections relating to investment performance and describing FWLL's business and financial condition. Bates was also regularly involved at key points of the chain of distribution of the securities, including personally soliciting investors. When soliciting, he made valuations as to the merits of the securities, provided estimates of future profits, and participated in sales negotiations. Bates paid transaction-based compensation to the sales team for securities sold. Bates was not registered as a broker or associated with a registered broker-dealer at the time of these transactions.

## FIRST CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Securities Act
### Section 17(a) of the Securities Act
### (against Defendants Uresti and Bates)

39. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

40. By engaging in the conduct described herein, Defendants Uresti and Bates, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; and/or (c) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

41. With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Defendants Uresti and Bates acted at least negligently. With respect to violations of Section 17(a)(1) of the Securities Act, Defendants Uresti and Bates acted with scienter and engaged in the referenced acts knowingly or with severe recklessness.

42. By reason of the foregoing, Defendants Uresti and Bates have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Exchange Act
### Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (against Defendants Uresti and Bates)

43. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

44. By engaging in the conduct described herein, Defendants Uresti and Bates, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

45. Defendants Uresti and Bates acted with scienter and engaged in the referenced acts knowingly or with severe recklessness.

46. By reason of the foregoing, Defendants Uresti and Bates violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Violations of the Securities Registration Provisions of the Securities Act
Sections 5(a) and 5(c) of the Securities Act
(against Defendants Uresti and Bates)**

47. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

48. By engaging in the conduct described above, Defendants Uresti and Bates, directly or indirectly, singly and in concert with others, have (a) made use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell, through the use or medium of written contracts, offering documents, or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried and caused to be carried through the mails and in interstate commerce, by the means and instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell, through the use or medium of written contracts, offering documents, or otherwise, securities as to which no registration statement has been filed.

49. By reason of the foregoing, Defendants Uresti and Bates violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and 77(e)(c)].

## FOURTH CLAIM FOR RELIEF

### Violations of the Broker-Dealer Registration Provisions of the Exchange Act
### Section 15(a) of the Exchange Act
### (against Defendants Uresti and Bates)

50.     The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

51.     Defendants Uresti and Bates each acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)] because they engaged in the business of effecting transactions in securities for the account of others.  While engaged in the business of effecting transactions in securities for the account of others, Defendants Uresti and Bates made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(b)] or associated with a broker or dealer as required by Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

52.     By reason of the foregoing, Defendants Uresti and Bates violated, and unless restrained and enjoined will in the future violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## RELIEF REQUESTED

The SEC respectfully requests that this Court:

(1)     Permanently restrain and enjoin Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

(2) Prohibit Defendant Bates, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(3) Permanently restrain and enjoin each Defendant from directly or indirectly, including, but not limited to, through any entity owned or controlled by each Defendant, participating in the issuance, purchase, offer, or sale of any oil-and-gas related securities provided, however, that such injunction shall not prevent Defendants from purchasing or selling oil-and-gas related securities for their own personal account;

(4) Order Defendants to each disgorge an amount equal to the funds and benefits obtained illegally, or to which such Defendant is otherwise not entitled, as a result of the violations alleged, plus prejudgment interest on that amount;

(5) Order Defendants to each pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(6) Order such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

The SEC demands a trial by jury on all issues that may be so tried.

Dated:  September 28, 2018                    Respectfully submitted,


                                                     */s/ Keefe M. Bernstein*
                                                     Keefe M. Bernstein
                                                     Texas Bar No. 24006839.
                                                     James E. Etri
                                                     Texas Bar No. 24002061
                                                     Rebecca R. Fike
                                                     Texas Bar No. 24065228
                                                     Securities and Exchange Commission
                                                     Burnett Plaza, Suite 1900
                                                     801 Cherry Street, Unit #18
                                                     Fort Worth, TX 76102-6882
                                                     Phone: 817-900-2607
                                                     Fax: 917-978-4927
                                                     bernsteink@sec.gov

                                                     ATTORNEYS FOR PLAINTIFF